UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PAMELA MCCARTHY                                    CIVIL ACTION

VERSUS                                             NUMBER: 08-3860

MICHAEL J. ASTRUE,                                 SECTION: "A"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


**<u>REPORT AND RECOMMENDATION</u>**


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2E(B), this matter comes before the Court on the parties' briefs following a decision of the Commissioner of the Social Security Administration awarding plaintiff Disability Insurance Benefits ("DIB") for only a closed period of time. (Rec. docs. 10, 14).

Pamela McCarthy, plaintiff herein, filed the subject application for DIB on November 4, 2004, alleging disability as of December 30, 2001. (Tr. pp. 66-68). In a Disability Report dated April 28, 2005, the conditions resulting in plaintiff's inability to work were identified as severe pain in the neck, upper

extremities, lower back, and leg; fibromyalgia; Chron's disease with permanent ileostomy; severe headaches; and, weakness and pain in the hands. (Tr. pp. 71-78). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on March 18, 2005. (Tr. pp. 60-63). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on July 2, 2007 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 50-51, 713-737). On September 26, 2007, the ALJ issued a written decision in which he concluded that plaintiff was disabled from December 30, 2001 through March 18, 2004 and was thus entitled to an award of DIB for that closed time period. (Tr. pp. 13-22). Commencing on March 19, 2004, however, the ALJ found that plaintiff had experienced medical improvement related to her ability to work such that she was able to perform a significant number of jobs existing in the national economy and was, therefore, no longer entitled to DIB. (Tr. pp. 22-29). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 5-7). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In the brief supporting her request for judicial review,

plaintiff frames the issues to be resolved as follows:

>    1.    [t]here is a lack of substantial evidence to
>          support the Administrative Law Judge's decision
>          that claimant underwent "medical improvement" as of
>          March 19, 2004;
>
>    2.    [t]he Administrative Law Judge failed to consider
>          pursuant to *Watson v. Barnhart* whether claimant
>          could both obtain and maintain employment.
>
>                                     (Rec. doc. 10, pp. 3-4).

Relevant to the issues to be decided by the Court are the

following findings made by the ALJ:

>    1.    [t]he claimant met the insured status requirements of the
>          Social Security Act as of December 30, 2001, the date the
>          claimant became disabled.
>
>    2.    [t]he claimant has not engaged in substantial gainful
>          activity since December 30, 2001, the alleged onset date
>          (20 CFR 404.1520(b) and 404.1571 et seq.).
>
>    3.    [a]t all times relevant to this decision, the claimant
>          has had the following severe impairments: status post
>          anterior cervical fusion, multilevel degenerative
>          cervical and lumbar disc disease, status post diskectomy
>          at L4-5 in the remote past, status post bilateral carpal
>          tunnel release, and status post left arthroscopic rotator
>          cuff surgery (20 CFR 404.1520(c)).
>
>    4.    [f]rom December 30, 2001 through March 18, 2004, the
>          period during which the claimant was disabled, the
>          claimant did not have an impairment or combination of
>          impairments that met or medically equaled an impairment
>          listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR
>          404.1520(d)).
>
>    5.    [a]fter careful consideration of the entire record, the
>          undersigned finds that, from December 30, 2001 through
>          March 18, 2004 the claimant had the residual functional
>          capacity to perform less than sedentary work on a regular
>          and continuing basis.

6. [f]rom December 30, 2001 through March 18, 2004, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. [t]he claimant was born on November 26, 1960 and was 41 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. [f]rom December 30, 2001 through March 18, 2004, the claimant's acquired job skills did not transfer to other occupations within her very limited residual functional capacity as defined above (20 CFR 404.1568).

10. [f]rom December 30, 2001 through March 18, 2004, considering the claimants age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. [t]he claimant was under a disability, as defined by the Social Security Act, from December 30, 2001 through March 18, 2004 (20 CFR 404.1520(g)).

12. [m]edical improvement occurred as of March 19, 2004, the date the claimant's disability ended (20 CFR 404.1594(b)(1)).

13. [b]eginning on March 19, 2004, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2)).

14. [a]fter careful consideration of the entire record, the undersigned finds that, beginning on March 19, 2004, the claimant has had the residual functional capacity to perform a wide range of light work.

15. [t]he medical improvement that has occurred is related to the ability to work (20 FR 404.1594(b)(4)(i)).

16.  [b]eginning on March 19, 2004, the claimant has been unable to perform past relevant work (20 CFR 404.1563).

17.  [t]he claimant was born on November 26, 1960 and was 43 years old, which is defined as a younger individual age 18-44, as of March 19, 2004 the date medical improvement occurred (20 CFR 404.1563).

18.  [t]he claimant has at a least high school education and is able to communicate in English (20 CFR 404.1564).

19.  [b]eginning on March 19, 2004, transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

20.  [b]eginning March 19, 2004, considering the claimant's age, education, work experience, and residual functional capacity, the claimant has been able to perform a significant number of jobs in the national economy (20 CFR 404.1560(c) and 404.1566).

21.  [t]he claimant's disability ended on March 19, 2004, (20 CFR 404.1594(f)(7).

(Tr. pp. 16-17, 20-22, 24, 27-29).

Judicial review of the Commissioner's decision is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are

supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

In cases such as this one in which a claimant is awarded DIB for a closed period of time, two decision-making processes occur, each of which has its own separate analysis.  First, the claimant seeking DIB bears the burden of proving that she is disabled within the meaning of the Social Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not

less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. Harrell, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2. an individual who does not have a "severe impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of this analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth

step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).

If the claimant successfully demonstrates that she is disabled, the second aspect of the decision-making process then requires the ALJ to determine if the disability continues through the date of his written decision. The Fifth Circuit has held that the medical improvement standard for termination of benefits under continuing disability review applies in cases involving an award of a closed period of benefits, with the government bearing the burden of proving that the claimant is no longer disabled after a date certain. Waters v. Barnhart, 276 F.3d 716, 718-20 (5th Cir. 2002). The government may cease paying DIB beyond that date if substantial evidence demonstrates that: (1) there has been medical improvement related to an individual's ability to work and (2) the individual is now able to engage in substantial gainful activity. 42 U.S.C. §423(f); 20 C.F.R. §404.1594(a). Medical improvement is defined as any decrease in the medical severity of a claimant's impairment which was present at the time of the most recent favorable medical decision that the claimant was or continued to be disabled. 20 C.F.R. §404.1594(b)(1). The second part of the evaluation process

relates to the ability to engage in substantial gainful activity. In making this determination, the Commissioner unitizes the eight-step sequential analysis set forth in 20 C.F.R. §404.1594(f), as follows:

1.    is the claimant engaged in substantial gainful activity? (If so, the disability has ended).

2.    if not, does the claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing).

3.    if not, has there been medical improvement?

4.    if there has been medical improvement, is it related to the claimant's ability to work?

5.    if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable?   (If not, the disability is continuing).

6.    if there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended).

7.    if so, is the claimant able to engage in past relevant work? (If so, the disability has ended).

8.    if not, is the claimant able to perform other substantial gainful activity?

See also Griego v. Sullivan, 940 F.2d 942, 944 n.1 (5th Cir. 1991).

As noted earlier, an administrative hearing in the proceedings

below went forward on July 2, 2007. Based on a review of the transcript of that proceeding it appears that the hearing had actually been commenced on May 8, 2007 but was continued to allow plaintiff's counsel additional time to obtain and submit records that were generated in plaintiff's workers' compensation proceeding. At the outset of the hearing, counsel and the ALJ debated whether the testimony of the medical experts who had been deposed in plaintiff's workers' compensation case was consistent with the results of a functional capacity evaluation ("FCE") that had been performed several years earlier. Counsel also argued that the results of a consultative evaluation performed in 2005 at the behest of the Administration produced findings suggestive of a greatly eroded occupational base even for sedentary work. The ALJ, however, countered that the doctors' deposition testimony was essentially consistent with the earlier FCE findings and that one of the physicians, Dr. Hazem Eissa, had only treated plaintiff with prescribed medication for the previous thirty months. (Tr. pp. 715-718).

After the documentary exhibits were admitted into the record, plaintiff took the stand. She was forty-six years of age at the time and had not looked for work since the hearing was begun two months earlier primarily due to pain on a daily basis. Plaintiff testified that she had to take pain medication earlier in the day

simply to be able to get out of bed and that she practically lived with a heating pad and TENS Unit. On a scale of "1" to "10", plaintiff described her neck pain as a "7" to "8". The pain was described as stabbing and tingling in nature which began in the neck and shoulder area and radiated down the left arm and into the hand. If she turned the wrong way her neck would make a snapping or crackling noise and she would see stars. Plaintiff also suffered from severe headaches. To relive her neck pain, plaintiff took Lortab 10, muscle relaxers twice per day, and Zanaflex and Amitriptyline at night to sleep and for spasms. Dr. Eissa was only prescribing these medications at this point in time as plaintiff had reached maximum medical improvement ("MMI").

In terms of daily activities, plaintiff spent a good deal of time with her daughter and two year-old twin grandchildren. Time was spent watching TV at the daughter's house, going shopping or to lunch, and running routine errands. Occasionally, plaintiff would go to the casino with her mother. Plaintiff was able to make a simple meal such as a sandwich but testified that her husband did all of the cooking. Plaintiff's husband was a postal worker who had suffered an on-the-job injury and had not worked in several months. (Tr. pp. 718-728).

Upon being tendered to her attorney for further questioning, plaintiff testified to manipulation problems and weakness in the

hands, with sharp pain on the left side, sometimes causing her to drop things. Plaintiff estimated that, with support, she could stand for one-hour before experiencing discomfort in the upper body. She could sit for only fifteen minutes before her neck needed support. When asked about any possible side-effects from taking Lortab and Norflex, plaintiff testified that she sometimes felt lightheaded, fuzzy, and slow if she did not eat beforehand making comprehension frequently more difficult. Plaintiff's headaches occurred at a rate of four to five per week, usually lasted all day, and rendered her unable to concentrate. (Tr. pp. 728-730).

Thomas Meunier, a VE, was next to take the stand. He first classified plaintiff's past job as a casino dealer as light, skilled work and her past job as a grocery cashier as light, semi-skilled work. The ALJ then posed a hypothetical question to Meunier which assumed an individual of plaintiff's age, education and work experience who could engage in light work activity; who could occasionally climb, stoop, kneel, crouch, and crawl; who could frequently balance; who could engage in occasional bilateral overhead reaching; and, who should avoid concentrated exposure to workplace extremes and hazards. With those limitations in mind the VE testified that the described individual could perform plaintiff's past work as a casino dealer. However, if reaching in

all directions was limited to only occasional, almost the entire base of light and sedentary work would be eliminated. To the hypothetical question as originally framed the ALJ then removed the limitation on reaching but added a restriction against working "very fast". In answer to the hypo as amended the VE testified that the described individual could not perform plaintiff's past work. However, the individual could perform various sedentary-level jobs including a range of cashier jobs, information clerk, food order clerk, or receptionist, with significant numbers of such jobs existing in the local economy. In response to a question from plaintiff's attorney, the ALJ stated that the restrictions set forth in his second hypothetical question to the VE were consistent with the testimony Dr. Eissa had given in his second deposition. Upon being tendered to plaintiff's counsel for further questioning, counsel added to the ALJ's second hypothetical the occurrence of severe headaches four to five times per week with a resulting marked impairment on concentration. In answer to that amended hypothetical question, the VE testified that the described individual would essentially be unemployable. (Tr. pp. 730-737).

Plaintiff's medical history is rather extensive, starting with a diagnosis and treatment of Chron's disease going back over twenty years. Following a fall, plaintiff underwent a L4-5 diskectomy in 1991. She also had a C5-6 fusion in 1996 and an ileostomy in 1998.

On December 29, 2001, plaintiff was involved in an accident at the casino where she worked and ultimately had bilateral carpal tunnel releases and left shoulder arthroscopic surgery in 2003.  Following the latter surgeries, plaintiff's condition was monitored by Dr. Eissa of the Ochsner Clinic.  As of December 3, 2003, treatment consisted of Lortab, Baclofen, and Klonopin at night for sleep. Physical examination findings were positive for facet loading and muscle spasms bilaterally in the neck but with no radicular symptoms. Injections of cortisone and Botox had not been effective. The assessment was cervicalgia with posterior element pain and degenerative changes and muscle spasms in the neck.  The dosages of Lortab and Baclofen were increased, Klonopin was continued, and Neurontin was to be started. Plaintiff's most recent MRI had been over one year earlier. (Tr. p. 194).

By January 23, 2004, Baclofen had been discontinued by plaintiff due to its ineffectiveness and Neurontin had been stopped secondary to side-effects.  Plaintiff had been referred to but had not yet seen a neurologist and Dr. Eissa recommended an EMG because of complaints of left upper extremity weakness.  Dr. Eissa cleared plaintiff to undergo a FCE but he was not very optimistic that plaintiff would resume work.  The doctor declared plaintiff to be at MMI from a conservative management standpoint.  Dr. Eissa deferred to the opinion of a neurosurgeon as to whether plaintiff

would benefit from further surgery. (Tr. p. 193).

On February 2, 2004, plaintiff was evaluated by Dr. Michael Puente, a neurologist. Plaintiff reported persistent pain since her 2001 workplace injury, particularly to the neck and left shoulder, pain and numbness in both hands, and a tendency to drop objects. Plaintiff's major complaint at the time was chronic neck pain and associated headache, with pain across the back of the neck radiating towards the top of the head, oftentimes encompassing the entire head or settling into the forehead area. The pain was described as throbbing or pressure unassociated with other symptoms. Plaintiff also related a long history of migraine headaches, associated with nausea and vomiting, which had occurred at a rate of two to three per year but which had increased to about twice per month.

Previous studies reviewed by Dr. Peunte included EMG/NCV results from 2002 and a 2002 MRI report of the cervical spine. Plaintiff advised the doctor of problems with depression and insomnia, sleeping only four to five hours per night. Upon neurologic examination, plaintiff did not appear to be uncomfortable in any way and was observed to move quite easily. She was alert and oriented and speech was normal. Examination of the head was unremarkable and one of the neck revealed no paraspinal muscle spasm. Plaintiff did have some tightness in the

neck and resisted full movement in any direction, complaining of discomfort, but she did have essentially a full range of motion of the neck in all directions. Manipulation of the shoulder, elbow, and wrist joints elicited no symptoms with normal strength and tone throughout. Plaintiff described a weakly positive Tinsel's sign over both carpal tunnel syndrome surgical sites. Senses were intact and deep tendon reflexes were 1-2+ and symmetric in the upper and lower extremities. Coordination and gait were normal. Dr. Puente's assessment was chronic pain syndrome but he did not think plaintiff had a cervical radiculopathy or other focal problem to account for her symptoms. Plaintiff also suffered from muscular cervicalgia with associated muscle contraction-type headaches and occasional associated migrainous headaches. Other factors contributing to plaintiff's pain were insomnia and depression. The plan was to add Elavil to plaintiff's list of medications, to discontinue Klonopin if the Elavil was effective, to eventually substitute Zanaflex for Baclofen, and to limit Lortab to three times per day. (Tr. pp. 519-523).

Plaintiff returned to Dr. Puente for follow-up evaluation on March 15, 2004. She was described as "markedly improved", "smiling and in good spirits." Plaintiff reported that she was sleeping much better and that she had not had any "bad headaches" since her previous visit. Klonopin had been discontinued entirely and the

dosages of Baclofen and Lortab had been decreased with no new complaints or side effects. On examination, plaintiff's neck was supple and non-tender although she did complain of some stiffness with full manipulation in any direction. The remainder of the examination of was "stable". The plan was to substitute Zanaflex for Baclofen, to continue on Elavil, and to decrease the dosages of Lortab. Dr. Puente closed his treatment note with a notation that plaintiff was scheduled to undergo an FCE later in the week. The doctor remarked that he felt the evaluation was "appropriate" and that he believed that plaintiff would "... do very well and hope[d] that she will be able to return to work in the very near future." (Tr. pp. 516-518).

On March 19, 2004, plaintiff reported for the anticipated FCE, having taken no prescription medications beforehand. She complained of a headache, cervical spine pain, and left upper trapezius pain as well as pins-and-needles in the left hand over the dorsal, radial aspect. Pre-test pain was rated at a level of "5" and post-testing pain was rated to be a "6". As requested, plaintiff called the FCE evaluator three days post testing and advised that her pain as still at a level of "6" despite taking her medications following the test. Results of a neuromusculoskeletal examination revealed active range of motion of the upper and lower extremities to be within normal limits. Strength in the extremities was 5/5 except

for 4+/5 strength of left shoulder flexion, abduction, and external rotation and 4/5 strength in the cervical spine upon flexion. Lumbar range of motion was 56º flexion, 15º extension, 50% of normal for left rotation, and 75% of normal for right rotation. Increased cervical pain was reported with lumbar extension. Active range of motion of the cervical spine was 48º of flexion, 35º of extension, 70º of left rotation, and 64º of right rotation. Plaintiff complained of increased pain with extension and right rotation. Palpation of the C2-6 spinous processes, the C3-6 articular pillars, and the bilateral upper trapezius muscle elicited complaints of tenderness but palpation of the left shoulder was unremarkable. Axial loading and Spurling's tests were positive for reproduction of symptoms but symptoms decreased with cervical distraction. Accessory mobility tests could not be performed accurately due to complaints of pain and guarding.

The results of the FCE were felt to be reliable and valid, with plaintiff exhibiting consistent and reasonably good effort. Based on the results of the testing the evaluator believed that plaintiff was capable of light level work and that she could return to her previous job as a casino dealer with the following restrictions: occasional lifting of up to thirty pounds except for overhead lifting which was limited to ten pounds; frequent lifting of fifteen pounds except for overhead lifting which was limited to

five pounds; occasional carrying of thirty pounds; static-crouching limited to thirty minutes per eight-hour workday; and, overhead activities limited to 2.5 hours per eight-hour workday. Sitting and standing were limited by pain but could be performed on a constant basis. Although plaintiff articulated a short-term goal "to get better and return to work", her attitude about returning to her previous job or work in general was less than optimistic. (Tr. pp. 483-510).

Plaintiff returned to Dr. Eissa on March 23, 2004 who remarked that she had lost weight, having decided to begin a daily walking regimen. She advised the doctor that she experienced severe pain and discomfort following the FCE and that the location and intensity of her pain had not changed from a level of "5" to "6". Plaintiff had discontinued the use of Klonopin secondary to feelings of grogginess but still took Amitriptyline and was sleeping about six hours per night. The assessment was cervicalgia with posterior element pain, degenerative disease of the spine, and muscle spasm of the neck. Plaintiff was to return to Dr. Eissa on an as-needed basis and for prescription refills every three months. (Tr. p. 295).

A further follow-up evaluation by Dr. Eissa went forward on June 7, 2004. Despite the results of the FCE the doctor felt it "very unlikely" that plaintiff could return to any form of gainful

employment. Plaintiff's left neck and shoulder pain were unchanged but she had lost some weight. The diagnosis was left upper trapezius muscle spasm, left cervical facetogenic pain possibly at C6-7, and headaches. Plaintiff was to be monitored by Dr. Puente and was to continue to take her prescribed medications. Dr. Eissa again rated plaintiff to be at MMI and he "[d]id not think that she is ready to go back to any form of gainful employment. This is permanent." Plaintiff was to return "as needed" and for prescription refills in three moths. (Tr. p. 296).

On August 10, 2004, plaintiff underwent an independent medical evaluation by Dr. Karen Ortenberg at the request of her former employer's workers' compensation carrier. Presenting problems included neck pain, headaches, and pain and weakness in both hands. The headaches occurred numerous times during the week but were unaccompanied by nausea, vomiting, photophobia, or phonophobia. Plaintiff described a stabbing sensation extending from the neck over the posterior aspect of both arms ending at the shoulders and pins-and-needles to the flexor surface of both hands. Plaintiff rated her pain as a "10" at its worst and as a "4" at its best with activities such as driving, shopping, or walking causing exacerbation. A heating pad, medication, and rest alleviated the pain to some degree but plaintiff was not particularly optimistic about returning to work. Medications remained Lortab, Zanaflex,

and Elavil.  Despite what had been reported by Dr. Eissa, plaintiff advised Dr. Ortenberg that she had gained weight since her work place injury and was up to 220 pounds standing at 5'7" tall.

Upon physical examination, cervical flexion was 2/3 of normal and extension was 50% of normal.  Increased pain was reported and cervical distraction tests were negative. Cervical rotation was within normal limits. Upper extremity motor strength was normal except for a slightly weak left shoulder flexion, abduction, and external rotation at 4+ out of 5.  Active range of motion to the upper extremities was within normal limits.  Deep tendon reflexes were symmetric and normal as was sensation.  Lumbar range of motion was normal for flexion and 50% of normal for extension and rotation with increased symptoms on extension. Lower extremity range of motion was normal as were deep tendon reflexes.  Straight leg raising was negative and there was no evidence of atrophy, spasm, or fasciculations.  Plaintiff did report pain with deep palpation over the cervical paraspinal muscles extending to the suboccipital region over the upper trapezius and deltoid muscles bilaterally as well as to the medial scapular borders.

As part of her evaluations, Dr. Ortenberg reviewed numerous records documenting plaintiff's treatment with various practitioners, including Doctors Eissa and Puente, as well as the FCE results.  Based on a review of all the records and the results

of her examination, Dr. Ortenberg believed that plaintiff's workplace injury in 2001 had aggravated pre-existing neck and carpal tunnel problems as well as left shoulder degenerative changes. Dr. Ortenberg agreed with Dr. Puente's approach of medication tapering, particularly the Lortab which had not significantly improved plaintiff's functional status and could result in physical dependence. The doctor did not have the benefit of a pain psychological evaluation that had reportedly been performed and low dose antidepressants and/or occupational therapy were thought to possibly assist plaintiff in identifying non-medication pain management strategies and coping skills.

In terms of the FCE findings, Dr. Ortenberg felt that plaintiff could only rarely perform overhead lifting activities and that she would likely require the opportunity to change positions and have frequent stretching breaks. Given the extended period of time that plaintiff had been out of work the doctor believed it was unlikely that she could tolerate an eight-hour workday immediately. Dr. Ortenberg thus suggested a work conditioning program of six to eight weeks followed by a transition back to full-time employment over a period of four to six weeks and she offered her medical group to undertake that effort. Finally, with respect to MMI, the doctor felt that plaintiff's physical condition had reached a plateau although she may experience periods of time when her

symptoms wax and wane. No further surgical intervention was recommended. While plaintiff was thought to need physician follow-up three or four times per year as well as being on a permanent exercise program, Dr. Ortenberg opined that plaintiff was "... able to work with her current pain level at light duty capacity with physician supervision and follow up" especially when trying to taper off of Lortab. (Tr. pp. 181-189).

Over a four-day period in August of 2004, plaintiff underwent a psychological pain evaluation at the hands of Dr. Kevin Greve, a clinical psychologist and neuropsychologist. In the initial interview, plaintiff described herself as a "control freak" who was still active a few hours at a time but did experience "bad days". Neck pain was rated as "5" at the time and it ranged anywhere from a "3" to "4" to a "10". Headache pain was rated as "5" to "6" at the time and ranged anywhere from a "2" or "3" to a "10+" and was known to spike frequently and last for days. Following her carpal tunnel release, plaintiff's right hand functioning was 100% and her left hand was 70% but were not as good as they were immediately after surgery. Plaintiff's left shoulder had greatly improved following surgery but was sometimes tight. She denied cognition problems, had difficulty sleeping, and reported light and sound sensitivity with headaches. Plaintiff's activities of daily living were described as "OK" with her husband and son doing most of the

cooking and cleaning but plaintiff doing "a little" of those chores, managing the budget, driving, and engaging in some social activities.

Plaintiff was administered a battery of tests during the four-day evaluation. Based on the results of those tests, plaintiff's interview, and review of various treatment records, Dr. Greve did not feel that there was objectively documented pathology underlying plaintiff's neck complaints. Cognitive functioning was within normal limits but there was significant psychological overlay including somatization and a dysfunctional compulsive personality style. However, there was no evidence of acute psychological pathology such as depression or anxiety. Plaintiff's current psychological issues were not caused by her workplace injury but were felt to reflect a longstanding personality style. Although they were not disabling in and of themselves, they were obstacles to rehabilitation, recovery, and a return to work. The final diagnosis was pain disorder with both psychological factors and general medical conditions. Dr. Greve thought that plaintiff may benefit from attending an integrated, multi-disciplinary physical rehabilitation program as opposed to physical therapy or a work hardening program. Dr. Greve even noted that Dr. Ortenberg's group offered the type of program he was recommending. (Tr. pp. 696-706).

On September 1, 2004, plaintiff returned to the Ochsner Clinic

where she was examined by Dr. Richard Lacour. In the note from that date that was signed by both Dr. Lacour and Dr. Eissa, plaintiff reported that the Amitriptyline and Lortab continued to relieve her symptoms but that she had exhausted her supply of the former drug. Zanoflex and Baclofen had been discontinued by Dr. Puente. Plaintiff complained of increased hand numbness and pain, especially at night. Plaintiff was offered injections to the carpal tunnel sheath but opted instead to use cock-up splints at night in conjunction with a home exercise program. Plaintiff rated her pain on this date as a "5" to "6". She also requested a Physician's Certification of Mobility Impairment (i.e., a handicap parking permit). The assessment on this date was left upper trapezius muscle spasm, left cervical facetogenic pain possibly at C6-7, and chronic headaches. Plaintiff was given a refill on her Amitriptyline and a prescription for cock-up splints. In the concluding portion of the note Dr. Lacour stated "[p]er Dr. Eissa, this patient is at Maximum Medical Improvement and is not able to return to any form of gainful employment. This is a permanent disability." (Tr. p. 191). Plaintiff was thus issued a Physician's Certificate of Mobility Impairment which indicated that she was "permanently impaired" (i.e., suffered from a condition that was expected to last at least two years with additional physician certificated required at each renewal). (Tr. p. 409).

On September 10, 2004, the medical case manager who had been assigned to plaintiff's workers' compensation claim drafted a letter memorializing the results of a conference she had recently had with Dr. Puente. The doctor signed off on the letter on September 24, 2004 confirming the following: plaintiff's primary diagnosis was cervicalgia and chronic pain and she was not a candidate for surgery; the FCE results indicated that plaintiff could return to her light-level job as a dealer; however, to allow for a return to work plaintiff should first undergo some type of work hardening/conditioning for four to six weeks; plaintiff was not yet at MMI; and, plaintiff was not able to return to work until the foregoing recommendations had been followed. (Tr. pp. 533-534).

Plaintiff was seen by Dr. George Murphy on October 25, 2004 after having been rear-ended ten days earlier. Plaintiff complained of low back pain with some radiation into the back of the left leg, some increased neck pain, and some carpal tunnel symptoms. On examination, there was a slight limitation of neck motion in all directions but no spasm. There was spasm to the lower back on the left and straight leg raising was positive on the left and tight on the right. Plaintiff was to continue with her medications and an MRI was to be scheduled. (Tr. p. 237).

On November 3, 2004, plaintiff underwent the MRI studies that had been ordered by Dr. Murphy. The lumbar MRI revealed a

posterior protrusion of the L5-S1 disc; left posterolateral protrusions with multiple bulging of the intervertebral discs; and, questionable pervious surgical intervention. (Tr. pp. 227-229). The MRI of the cervical spine revealed a previous surgical intervention. (Tr. pp. 227-229). The MRI of the cervical spine revealed a previous surgical benefit of anterior interbody fusion at C5-6 with excellent creeping marrow substitution at that level; a possible C7 cryptic hemangioma; small protrusions at C6-7; a small posterior protrusion at T1-2; bulging of the C3-4, C4-5, and C7-T1 discs; straightening loss of the cervical lordosis possibly due to muscle spasm or patient positioning; cerebellar tonsils that appeared to extend caudally to the level of the foramen magnum but non-pathologic; and, questionable "empty sella" syndrome. (Tr. pp. 230-232). By November 8, 2004, plaintiff was still complaining of moderate symptoms. She was advised of the MRI results which revealed multilevel disease in both the neck and lower back. Plaintiff reported recent bladder control problems and was advised to consult with a neurosurgeon she had previously treated with. (Tr. p. 238).

Plaintiff returned to Dr. Lacour on December 14, 2004 and indicated that she had been doing well on her medications until running out of Elavil and experiencing a recurrence of her symptoms. The level of plaintiff's pain was unchanged as was the

doctor's assessment. Plaintiff was given refills of Elavil and Lortab in addition to a prescription for Flexeril as needed for muscle spasms. (Tr. pp. 299-300).

On February 3, 2005, plaintiff was consultatively evaluated by Dr. Camalyn Gaines at the request of the Social Security Administration. Plaintiff's major complaints at the time were neck, back, hand, and left shoulder pain. The pain was most severe in the neck and other areas included the lower back and hands. The pain was described as aching and throbbing with radiation from the neck into the shoulders and numbness and tingling in the hands. Plaintiff also reported occasional leg weakness which supposedly caused her to fall at times and that prolonged walking and bending aggravated her neck and back. The pain varied from day to day and was worse late in the evening but was relieved to some extent with pain medication and heat treatments. Plaintiff reported that on a "good day" she could walk up to two blocks without stopping. She had difficulty using stairs easily. Plaintiff could dress and bathe herself but did no house or yard work. She estimated that she could stand for only ten to fifteen minutes, sit for thirty minutes, and lift a gallon of milk.

Upon physical examination, plaintiff ambulated with a fairly normal gait pattern but had a mild antalgic gait in the left leg with heel and toe ambulation. There was tenderness to palpation at

L4-5 but no palpable spasm and straight leg raising was negative. Range of motion to the spine was a bit limited and plaintiff had a positive supraspinatus test with respect to the left shoulder. Thigh and calf circumferences were symmetric and plaintiff had 5/5 strength throughout with normal sensation and deep tendon reflexes. There was a positive Tinel's sign bilaterally but a negative Babinski.

Based upon the results of her examination and a review of select portions of plaintiff's medical records, Dr. Gaines' impression was: 1) prior fusion at C5-6 with residual decreased range of motion and cervicalgia but no evidence of acute or chronic nerve root irritation; 2) prior diskectomy at L4-5 with no evidence of acute or chronic nerve root irritation; 3) prior carpel tunnel release but symptomatic at the time; and, 4) prior left shoulder surgery with remaining evidence of mild impingement. The doctor opined that plaintiff could engage in limited standing and walking activities but could tolerate sedentary positions longer although she may still need to alternate positions. Dr. Gaines felt that plaintiff should avoid repetitive use of stairs, stooping, crouching, crawling, bending, kneeling, and squatting. Plaintiff should also avoid activities that required prolonged neck extension and rotation, repetitive overhead activities with the left upper extremity, and repetitive and prolonged gripping, grasping, and

other activities requiring repetitive wrist motion. Plaintiff was felt to be able to lift fifteen pounds but only occasionally and at waist level. (Tr. pp. 240-246).

On February 22, 2005, an Administration medical consultant reviewed the voluminous medical records then extant and found that plaintiff could lift twenty pounds occasionally, ten pounds frequently; could stand and/or walk at least two hours but less than four hours per eight-hour workday; had an unlimited ability to push and/or pull; could frequently balance, never climb ladders/rope/scaffolds, and could occasionally perform the other enumerated postural maneuvers; was limited to occasional bilateral overhead reaching and frequent bilateral handling but had an unlimited ability to finger and feel; had no visual or communicative limitations; and, who was to avoid concentrated exposure to extreme heat and cold, wetness, vibration, and workplace hazards. Essentially, plaintiff was found to be capable of a limited range of sedentary-level work. A second disability examiner reviewed the file on March 16, 2005 and assigned no additional limitations due to plaintiff's Crohn's disease and headaches. (Tr. pp. 247-255).

Plaintiff was seen again by Dr. Lacour on March 14, 2005 who remarked that she remained at MMI. Plaintiff's condition was essentially unchanged and the doctor's assessment remained the

same. She was given refills on her medications with a generic substitute to be taken in place of Flexeril after the comp carrier had ceased paying for the brand name drug. (Tr. pp. 301-302). Plaintiff returned to Dr. Lacour on June 14, 2005 and expressed satisfaction with her medications except for lately being awakened with muscle spasms. Norflex was substituted for Flexeril to minimize any tolerance issues. Refills were given on the Elavil and Lortab. (Tr. pp. 303-304). On October 4, 2005, plaintiff was seen again at the Ochsner Clinic, this time by Dr. Eissa. Hurricane Katrina had struck by that date and plaintiff had aggravated her neck and shoulder pain, described as a "7" to "8", while working on the damage to her and her daughter's houses. Otherwise, the prescribed medications were working "very well". The assessment on this date was cervical degenerative joint disease ("DJD") and pain, muscle spasms, and chronic pain. Refills for Elavil and Lortab were given and plaintiff was to return as needed or in three months. (Tr. p. 305).

On November 16, 2005, Dr. Eissa was deposed in plaintiff's workers' compensation proceeding. He was unsure if plaintiff suffered from shoulder problems prior to her workplace injury but speculated that she had because she had spoken of "aggravation". When asked whether the medications prescribed to plaintiff might affect an individual's ability to drive or work, the doctor

testified that it depended on the person, that some of his patients had taken even stronger medications and were still able to work. A Botox injection that was administered to plaintiff on May 13, 2003 was felt to be effective but yet plaintiff continued to complain of pain, causing the doctor to question whether there might be some psychological component. Medication treatment on a long term basis was a possibility. When asked to predict whether plaintiff's pain would get better or worse, Dr. Eissa simply indicated that she was at MMI. The doctor was then asked whether plaintiff could return to work. Apparently unaware of the FCE that had been conducted on March 19, 2004, Dr. Eissa testified that work was possible but that he would defer to the results of an FCE to determine what plaintiff was capable of. When directed to the report of the FCE that had already been conducted, Dr. Eissa essentially agreed that plaintiff could perform light-level work but that overhead lifting should be limited to ten pounds occasionally. The doctor was then asked whether plaintiff could return to her previous job as a dealer. In answer to that question he testified that pace and dexterity might be issues especially in light of plaintiff's medications. However, he endorsed a trial work period or a work hardening program which was essentially a form of treatment the doctor had previously recommended for other patients.

Continuing, Dr. Eissa testified that his diagnosis and treatment of plaintiff remained the same throughout the time that he saw her. He was unable to speak to the activities plaintiff was capable of prior to the workplace incident as compared with those she could engage in after the accident. When asked whether plaintiff's medications made her drowsy and impaired her functioning, the doctor initially had difficulty finding any supporting documentation. In terms of the self-reported pain scale, Dr. Eissa acknowledged that it did not address frequency. Dr. Eissa was unfamiliar with Dr. Puente but when directed to the correspondence the latter confirmed on September 22, 2004, Dr. Eissa testified that he agreed with the recommendations for light-level work preceded by a work hardening program but disagreed that plaintiff had reached MMI by that date. Dr. Eissa also agreed with the recommendations Dr. Ortenberg had made on August 12, 2004. Dr. Eissa believed that plaintiff was capable of performing some type of work. Asked whether he would consider sending plaintiff to physical therapy, Dr. Eissa responded that a work hardening program would be a "good idea." (Tr. pp. 321-351).

On cross-examination by plaintiff's counsel, the doctor was asked what restrictions he would impose on plaintiff's activities irrespective of the other opinions and findings in the record. In response, the doctor testified that he would endorse the FCE

33

findings but would add a restriction to avoid overhead activities. Asked if constant arm motion would cause difficulties, Dr. Eissa testified that a trial work period would reveal whether plaintiff was truly capable of dealer-related activities or not. In reviewing his letter to plaintiff's case manager, Dr. Eissa remarked that medication drowsiness was one of his main concerns in terms of the pace with which plaintiff could function and was the reason he "... put her off work ..." A change to plaintiff's medications was also a possibility if an on-site job evaluation demonstrated that the drugs she was taking were slowing her functioning. He also deferred to a neurologist with respect to any headache-related limitations. (Tr. pp. 351-353).

Plaintiff returned to Dr. Eissa for follow-up care on January 23, 2006 and reported that the medications were helping with her symptoms. The doctor remarked that plaintiff "... was on light duty with some restrictions" but "... cannot return back to her previous job as a dealer." The assessment on this date was cervical DJD with pain and muscle spasms. Once again, plaintiff was given refills for Elavil, Lortab, and Norflex and was to return as needed or in three months. (Tr. p. 306).

On January 24, 2006, plaintiff underwent a neurological evaluation for her headaches by Dr. Maria Palmer at the request of her attorney. Plaintiff reported migraine headaches at a rate of

one or two per year but the ones she was being evaluated for were of a different nature. These "never headaches" began a month or two after her workplace injury and were constant with frequent exacerbations but did not prevent plaintiff from engaging in daily activities. The headaches were localized to the back of the head and radiated to the front, mostly on the right side. There was no blurring of vision or dizziness with the headaches but they could be very severe. Plaintiff also complained that her neck hurt constantly and felt tight. Upon physical examination of the neck, plaintiff had severe cervical muscle spasm, predominantly on the right trapezius. She also had limited anterior flexion, lateral flexion, and rotation, mostly to the neck. Motor and sensory examinations were normal, coordination was normal, and reflexes were symmetrical. Dr. Palmer's impression was muscle contraction headaches secondary to chronic fasciomyositis of the right trapezius resulting from a chronic cervical sprain. Given the vintage of the problem, the doctor doubted whether plaintiff would recover and opined that it was a chronic condition that she would have to learn to live with. Dr. Palmer recommended a portable TENS unit, a regime of daily home treatments consisting of hot compresses, massage with Aspercream, and cervical traction. Plaintiff was also prescribed Soma. (Tr. pp. 559-581).

On January 31, 2006, Dr. Puente was deposed in plaintiff's

workers' compensation proceeding. He testified to his treatment history of plaintiff and his diagnosis of chronic pain syndrome which can be caused by various factors, including a lack of conditioning. When directed to the FCE report and a description of plaintiff's past job as a dealer, Dr. Puente testified that he agreed with the results of the evaluation and that from an objective standpoint, plaintiff should be able to return to that line of work. However, the doctor did not believe that plaintiff could have returned to that job at the time due to being fixated on her pain. It was for that reason that the doctor had recommended a work hardening or work conditioning program at which plaintiff could get herself back in a functional status and to deal with physical and non-physical aspects of pain. Even though Dr. Puente had seen plaintiff on only two occasions, her condition had significantly improved by the second visit and he was unsure why she did not return to him or follow his recommendations. Even without attending a work hardening program the doctor believed that plaintiff could perform some type of work. When asked about potential side-effects from Elavil and Zanaflex, Dr. Puente testified that the drugs were not addictive but may initially cause some drowsiness which should resolve in one to two weeks. (Tr. pp. 444-466).

Dr. Puente was then tendered to plaintiff's counsel for cross-

examination. He acknowledged that plaintiff suffered from muscle contraction headaches and he explained the differences between those and migraine headaches.  When asked about possible side-effects from Lortab the doctor testified an individual may become groggy when the drug was taken only occasionally but if taken constantly there should be no side-effects, only a decrease in effectiveness and possible addiction. Baclofen may cause some sedation as well.  Counsel then asked the doctor whether he would recommend that plaintiff return to work as a dealer if her medications caused sedation.  The doctor testified that he would make such a recommendation but that he may caution against driving. Based on his dealings with plaintiff, he did not view her as "sedated" nor should she be if on the prescribed drugs on a long-term basis.  (Tr. pp. 467-471).

On re-direct by the casino's attorney, Dr. Puente clarified that plaintiff suffered from a combination of migraine and muscle contraction headaches but most were in the latter category and resulted from her workplace accident.  Dr. Puente reiterated that he did not believe that plaintiff could have returned to work at the time of his first evaluation on February 2, 2004 due to her fixation on pain. She possibly could have done so by the time of his second evaluation on March 15, 2004 and she certainly could have done so soon thereafter if she had continued treating with Dr.

Puente consistent with his recommendations. (Tr. pp. 471-474).

On February 21, 2006, plaintiff was re-evaluated by Dr. Ortenberg. Plaintiff complained of neck pain to the C6 area which radiated bilaterally across the shoulders and up the sides of her head. The pain was never less than "3" to "4", was exacerbated by any prolonged activity, but was alleviated to some degree by medications and moist heat. Muscle contraction headaches were constant but worse at times. Plaintiff also had bilateral shoulder pain, left worse than right, and sharp pain in the left thumb. She estimated that she could walk or stand up to thirty minutes at a time, sit for up to forty-five minutes, and lift up to ten pounds. Plaintiff used a Life Cycle for up to thirty minutes three times per week.

On physical examination, cervical flexion was 2/3 of normal for flexion, mainly limited by pain. There was slight tenderness to palpation of the cervical surrounding soft tissue but no pain with palpation to the spine or bony landmarks. Upper extremity motor strength was normal except for minimally weak left shoulder flexion at 4+/5 abduction and external rotation. Upper extremity range of motion was normal. Lumbar range of motion was limited in full flexion primarily because of plaintiff's size. Lower extremity strength and range of motion were normal and straight leg raising was negative. Sensation was intact and there was no evidence of

muscle atrophy, spasms, or fasciculations. Dr. Ortenberg's impression was that plaintiff had undergone multiple surgeries in the past and also had a history of Chron's disease and fibromyalgia. Plaintiff continued to describe neck pain, headaches, and bilateral shoulder pain. Dr. Ortenberg agreed with the results of the earlier FCE and identified the primary obstacle preventing plaintiff from returning to work as inactivity and a lack of conditioning. The doctor therefore reiterated her earlier opinion that plaintiff was in need of work conditioning as a prerequisite to returning to work. Dr. Ortenberg also believed that plaintiff should taper off of the Lortab and the doctor questioned the wisdom of taking Soma as it is highly addictive. The doctor closed by offering her availability to manage plaintiff's rehabilitation efforts. (Tr. pp. 415-418).

Plaintiff returned to Dr. Eissa on April 4, 2006 and reported doing well on her prescribed medications, sometimes taking four Lortab per day and sometimes taking only two. Plaintiff's workers' compensation claim remained pending but she was hopeful that it would settle soon. The assessment was cervical degenerative joint disease with pain and muscle spasm. Given the status of her comp claim, plaintiff was given another refill on her medications but was instructed to have her primary care physician do so after that and if that were not possible, Dr. Eissa offered to wean her off of

the medications. (Tr. pp. 307-308).

In July of 2006, plaintiff began a work conditioning program at Industrial Safety and Rehabilitation as suggested by Dr. Ortenberg, initially attending several days per week. However, by August 3, 2006, the physical therapist recommended discharging plaintiff from the program due to poor tolerance after frequent reports of increased pain after visits and missing the last several visits due to pain and on the advice of her attorney. The therapist remarked that despite plaintiff's complaints of increased pain from the low level work conditioning program, she had the reported ability to lift her grandchildren while caring for them daily. (Tr. pp. 419-439).

Plaintiff returned to Dr. Eissa for medication refills on August 7, 2006 after the comp carrier had declined to have Dr. Palmer do so. Plaintiff declared her pain to be at a level of "10". Dr. Eissa's assessment was the same and he refilled plaintiff's prescriptions for Norflex, Elavil, and Lortab. (Tr. p. 309). Plaintiff was seen again by Dr. Eissa on November 2, 2006 and was assessed with cervicalgia with muscle spasm and degenerative joint disease. Plaintiff was to start Zanaflex and to wean off of the Elavil and was given refills for Lortab and Norflex. (Tr. p. 310).

On March 1, 2007, plaintiff was seen again by Dr. Eissa and reported a slight worsening of her left upper extremity symptoms.

Plaintiff had discontinued Elavil one month earlier and she indicated that Dynaflex was helping "tremendously" at night. On physical examination, plaintiff had a very mild impingement sign, positive set loading, and positive muscle spasm in the neck. The assessment was cervical DJD and muscle spasm. Plaintiff was given refills for Zanaflex, Lortab, and Norflex and was restarted on Elavil. (Tr. pp. 311-312). X-rays of the cervical spine taken on that date revealed a complete anterior fusion between the C5 and C6 vertebral bodies with osseous budging of the C5-6 interspace but were otherwise normal. (Tr. p. 316).

Dr. Eissa was deposed for a second time on April 11, 2007. Except for exacerbations resulting from post-Katrina cleanup activities, participation in the work hardening program, or following the discontinuation of Elavil, plaintiff's condition had remained essentially unchanged and Dr. Eissa only saw her every three months for medication refills. The doctor had adjusted plaintiff's medications over time and the ones she remained on had made her condition most stable. At his first deposition the doctor endorsed a work hardening program but he never inquired if plaintiff had participated in one. When asked if plaintiff was presently capable of light duty work Dr. Eissa deferred to the results of the FCE but explained that the primary obstacles were the alertness and pace the dealer job required. The doctor had not

tested plaintiff for mental acuity and he relied on her description of the job's demands. The doctor had no objection to plaintiff at least attempting to return to work. However, job stress may aggravate her condition but would certainly be alleviated by break periods. When plaintiff reported that she had stopped the work hardening program secondary to pain, he did not advise her against attending. (Tr. pp. 262-277). On questioning by plaintiff's attorney, the doctor testified that plaintiff would probably remain on prescription medication for the foreseeable future. (Tr. pp. 277-279). The hearing before the ALJ would subsequently go forward on July 27, 2007. (Tr. pp. 713-737).

As noted earlier, plaintiff challenges the decision to discontinue DIB on two grounds, the first one being that the Commissioner failed to carry his burden of proving that plaintiff was no longer disabled subsequent to March 18, 2004. Finding that contention to have merit, it will be recommended, for the reasons that follow, that the Commissioner's decision be reversed and that this case be remanded to the Administration for a calculation of benefits.

Because the FCE of March 19, 2004 provided the cut-off point for the payment of DIB, the Court will focus on the medical evidence generated shortly before and after that date. Plaintiff was cleared to participate in the FCE by Dr. Eissa on January 23,

2004, deferring to the opinion of a neurologist as to the necessity of further surgery. When evaluated by Dr. Puente on February 3, 2004, plaintiff reported pain and numbness in the hands and a tendency to drop objects. The assessment was chronic pain syndrome but no radiculopathy, cervicalgia with muscle contraction headaches, and occasional migraine headaches. Plaintiff's medications were adjusted and by March 15, 2004, her condition had undoubtedly improved "markedly" with better sleep and no migraines. Dr. Puente felt the FCE to be appropriate and he was optimistic that plaintiff would return to work in the near future. The FCE went forward on March 19, 2004 and produced findings suggesting a capability to perform a restricted range of light work and a return to plaintiff's past job as a dealer. Despite taking her prescribed medications, plaintiff still had increased pain days after the FCE and she so advised Dr. Eissa on March 23, 2004. Nevertheless, plaintiff had begun a walking regimen and had lost weight. Klonopin was discontinued secondary to grogginess.

When she returned to Dr. Eissa on June 7, 2004, plaintiff's weight had decreased further but the doctor was doubtful that she would ever return to work. However, by the time of her evaluation by Dr. Ortenberg on August 12, 2004, plaintiff's weight had increased to 220 pounds. Dr. Ortenberg believed that anti-depressants and/or occupational therapy were in order for pain

management and she stressed the need for a work conditioning program as a prerequisite to returning to work. Overhead activities were extremely limited and plaintiff needed to change positions and have frequent stretching breaks. Even with work conditioning, plaintiff would require physician follow-up to get to a point where restricted light duties could be performed. The psychological pain evaluation by Dr. Greve went forward shortly thereafter and while plaintiff had no acute psychological pathology, her psychological issues were the true obstacles to her rehabilitation, recovery, and a return to work. The diagnosis was pain disorder with psychological factors and various medical conditions. Dr. Greve recommended an integrated, multi-disciplinary physical rehabilitation program as opposed to physical therapy or work hardening.

Plaintiff had increased hand pain and numbness when seen by Dr. Lacour on September 1, 2004, especially at night. The assessment was left upper trapezius pain, left cervical facetogenic pain at C6-7, and chronic headaches. Plaintiff was declared to be at MMI and permanently disabled and was issued a handicap parking permit. Dr. Puente weighed in on the FCE results on September 24, 2004, agreeing that plaintiff could return to her dealer job but only after going through a work hardening program. Until that was accomplished, Dr. Puente declined to make the MMI finding and he

opined that plaintiff could not work unless his recommendations were followed. Plaintiff had positive straight leg raising findings when seen by Dr. Murphy on October 25, 2004 after being involved in a motor vehicle accident. An MRI done on November 3, 2004 revealed multi-level degenerative disease in the neck and lower back. On November 8, 2004, plaintiff reported bladder control problems to Dr. Murphy. Plaintiff's condition had worsened by December 14, 2004 after exhausting her supply of Elavil.

On December 3, 2005, plaintiff was consultatively evaluated by Dr. Gaines whose opinions are presumably of a conservative nature. Plaintiff reported occasional leg weakness causing her to fall and a fairly limited range of activities. Dr. Gaines felt that plaintiff could engage in only limited standing and walking activities but could tolerate sedentary positions longer but with a need to alternate positions. The range of postural and manipulative abilities were compromised and plaintiff could only occasionally lift fifteen pounds and then only at waist level. An Administration medical consultant who was also presumably of a conservative ilk opined that plaintiff was capable of only a limited range of sedentary work. Although the medical consultant did not clearly differentiate the time periods preceding and following the FCE conducted on March 19, 2004, the ALJ found that plaintiff was significantly more limited than was reported by the

consultant for the pre-FCE time period but were less limited than what the consultant had concluded for the post-FCE time period.

At this deposition on November 16, 2005, Dr. Eissa agreed with the results of the FCE but felt that plaintiff was incapable of engaging in overhead activities. With the exception of the MMI finding, Dr. Eissa agreed with Dr. Puente's previous recommendations as well as those of Dr. Ortenberg regarding the importance and need for some type of work hardening program. When deposed on January 31, 2006, Dr. Puente agreed with the FCE results from an objective standpoint but opined that plaintiff's fixation with pain rendered her unable to work. He admittedly retreated from his earlier opinion of September 24, 2004 when testifying that he believed plaintiff could do some type of work even in the absence of a work hardening program but he was unable to say when that would be. Although plaintiff's condition had improved by her second visit with Dr. Puente on March 15, 2004, a return to work was only a possibility and was compromised by the psychological factors underlying plaintiff's chronic pain syndrome.

On February 21, 2006, Dr. Ortenberg reaffirmed the need for a work hardening program as a condition to plaintiff's return to employability. Plaintiff began such a low level conditioning program in July of 2006 but was unable to complete it secondary to increased pain and poor tolerance. While the physical therapist

cited plaintiff's apparent ability to lift her grandchildren on a daily basis, such a capability embraces only one aspect of the range of activities required for work.  Plaintiff reported her pain as a level of "10" when seen by Dr. Eissa on August 7, 2006.  By March 1, 2007, plaintiff's shoulder symptoms had worsened further. At his re-deposition on April 11, 2007, Dr. Eissa testified that he would not object to plaintiff attempting to return to work but believed that alertness and pace issues caused by pain and medication may be problematic.

Understandably, the FCE test results of March 19, 2004 provide somewhat of an attractive stopping point to discontinue plaintiff's Social Security benefits. The medical records also indicate that plaintiff's condition improved to some extent in the time periods immediately preceding and following the FCE.  However, of concern to the Court is the fact that no less than four doctors who evaluated plaintiff believed that the successful completion of a work hardening program was a necessary prerequisite to her return to work.  Despite attempting such a program, plaintiff was unable to complete it due to increased pain and poor tolerance.  While the Court is not unmindful of a claimant's need to follow the treatment recommended by her doctors, plaintiff was simply physically incapable of completing the necessary conditioning.  Although this case is a close one, the Court recalls that it is the

Commissioner's burden to demonstrate that a claimant's disability has ended. <u>Waters</u>, 276 F.3d at 718-20. For these reasons, it will be recommended that the decision of the Commissioner be reversed and that plaintiff's case be remanded to the Administration for a calculation of benefits.

<b><u>RECOMMENDATION</u></b>

For the foregoing reasons, it is recommended that the Commissioner's decision be reversed and that plaintiff's case be remanded to the Administration for a calculation of benefits.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this __18th__ day of ____March____, 20_10_ .

 

 

_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE